UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LLOYD GARY TOWNSEND,

        Plaintiff,

    v.

JOHN SOTO,

        Defendant.

Case No. 15-cv-03692-JST

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: ECF No. 1

Petitioner Lloyd Gary Townsend seeks a writ of habeas corpus under 28 U.S.C. § 2254. The matter is now before the Court for consideration of the merits of the habeas petition. The Court denies the petition.

## I. BACKGROUND

Petitioner was convicted by a California state court jury of first degree murder and was sentenced to a prison term of 50 years to life. Petitioner's conviction was affirmed on direct appeal to the California Court of Appeal and the California Supreme Court. In his federal habeas petition, Petitioner raises three claims, each of which was presented to the California courts on direct appeal. First, Petitioner argues that two of the jury instructions, which were given to the jury in his trial—the 1996 versions of CALJIC Nos. 8.71 and 8.72—violated his due process rights under the U.S. Constitution by impermissibly shifting the burden away from the prosecution to prove each of the elements of first degree murder beyond a reasonable doubt. Second, Petitioner asserts that the trial court's admission of certain testimony from Petitioner's co-defendant (Maurice Frazier) violated his due process rights. Third, Petitioner raises a cumulative error claim.

/ / /

**A.      Factual Background**

The Court adopts the following description of the underlying crime and the evidence presented at trial from the California Court of Appeal's decision on direct appeal, which description Petitioner does not substantially contest in his petition:

> On September 17, 2007, [Maurice] Frazier got into an argument with Willie Tatmon during a basketball game at the Poplar Recreation Center (Rec Center) in Oakland. Witnesses heard Frazier threaten Tatmon, saying "I should shoot you," and, "People think I'm a sucker, they don't know me . . . . Anybody can get it." Frazier was also heard to say, "Let me calm down before I smoke this fool." Frazier went outside, but returned a few minutes later. He then shook hands with Tatmon and told him, "Everything is cool, Brother, it is good." Frazier then left.
>
> When Frazier arrived at his home, he saw [Lloyd Gary] Townsend and relayed what had happened at the Rec Center. Townsend called his girlfriend, Miesha Lampkins, and asked her to take him to play basketball. Lampkins drove Townsend, Frazier and a third person identified as "Twan" back to the Rec Center. Frazier said that someone had gotten into his "face" there. When they arrived at the Rec Center, the men told Lampkins to wait for them. Lampkins parked her car outside the main entrance and waited with the engine running.
>
> Frazier, Townsend and Twan entered the Rec Center about 10 to 20 minutes after Frazier had previously left the center. Frazier identified Tatmon to Townsend, telling him, "That's that fool over there." Frazier walked over to Tatmon, and the two men began to argue. Townsend then pulled out a gun and fired approximately four shots inside the Rec Center. Tatmon ran outside with Townsend and Frazier following. Frazier fired two shots at Tatmon, who had collapsed outside. Townsend fired four or five additional shots at Tatmon. Frazier, Townsend and Twan ran to Lampkins's car and Lampkins drove away.
>
> Tatmon died from multiple gunshot wounds. Three bullets had travelled through his body, and a nine-millimeter bullet entered into the right side of Tatmon's head, lodging in the left side of his brain. Four nine-millimeter shell casings were found inside the Rec Center, and five additional nine-millimeter casings were located outside in the area where Townsend was seen firing his gun. The nine-millimeter casings were all fired from a single firearm, a Glock nine-millimeter semi-automatic pistol. A .40-caliber shell casing was found just outside the door to the Rec Center, and a .40-caliber slug was found on the sidewalk directly across the street from where Tatmon was shot outside.
>
> The day after the shooting, Lampkins had her black car painted red. Although she retracted her statement at trial, Lampkins told police that Townsend had told her to have the car painted and Townsend's sister had given her the money to do so.

1
2
3
4
5
6

Frazier was interviewed by Oakland police officers on September 20, 2007. In the tape recorded interview, Frazier initially denied involvement in the shooting but later admitted his participation. Frazier said that he had fired two shots from a .40-caliber Beretta but said he was not looking at Tatmon, who was eight or nine yards away. Frazier said he had the Beretta at the basketball game wrapped up in his shirt and jeans. He eventually told the police that it was Townsend who went back to the Rec Center with him. In a second taped interview on September 20, 2007, Frazier admitted that he had pointed his weapon at Tatmon when he fired it. Frazier again named Townsend as his confederate, blaming Townsend for the shooting.

7
8
9
10
11
12
13
14
15
16
17
18

At trial, Frazier testified that he became upset with Tatmon during the basketball game because Tatmon had been disrespectful to him. While Frazier could not remember the words he used, he was very angry and might have said something that could have been construed as a threat. After leaving the Rec Center, Frazier saw Townsend and told him that he had just "got into it with somebody over at the gym" and that he wanted to "whoop his ass." Townsend suggested they go back to the gym and called his girlfriend to give them a ride. At the Rec Center, Frazier approached Tatmon, looking for an opportunity to hit him. Frazier said he did not know Townsend had a gun and was shocked when Townsend shot Tatmon. After Tatmon ran out the door, Frazier said that he fired a shot without looking where he was shooting. Frazier claimed that he did so because of a "look" that Townsend gave him, which Frazier interpreted to mean that he "better do something too" and that Townsend might shoot him if Frazier did not also fire a shot. Outside of the Rec Center, Frazier saw Townsend firing his gun. They then ran to Lampkins's car and drove away. Frazier said he gave his gun to Townsend to discard. Frazier insisted that he had only intended to "jump" Tatmon with Townsend, and that he did not intend to shoot Tatmon or to encourage anyone else to do so. Townsend did not testify.

People v. Frazier, No. A134351, 2014 WL 505354, at *1–3 (Cal. Ct. App. Feb. 10, 2014).

19

### B.    Procedural History

20
21
22
23
24

Petitioner and his co-defendant Maurice Frazier were charged with one count of murder in violation of California Penal Code § 187.  On September 1, 2011, after a 24 day jury trial in the Alameda County Superior Court, Petitioner was convicted of first degree murder.  On September 6, 2011, Frazier was convicted of second degree murder.  On January 6, 2012, the trial court sentenced Petitioner to a prison term of 50 years to life.

25
26
27
28

Petitioner appealed his conviction to the California Court of Appeal, raising the same three claims he now presents here:  (1) an instructional error claim; (2) a claim based on an evidentiary ruling made by the trial court; and (3) a cumulative error claim.  On February 10, 2014, the

1   California Court of Appeal rejected each of Petitioner's claims in a reasoned opinion, affirming

2   his conviction. <u>Frazier</u>, 2014 WL 505354. On May 14, 2014, the California Supreme Court

3   summarily denied Petitioner's petition for review.

4         On August 12, 2015, Petitioner filed his federal habeas petition. The Court heard oral

5   argument on the petition on June 28, 2016.

6   **II.**      **DISCUSSION**

7        **A.**      **Standard of Review**

8         This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in

9   custody pursuant to the judgment of a State court only on the ground that he is in custody in

10   violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); <u>Rose</u>

11   <u>v. Hodges</u>, 423 U.S. 19, 21 (1975). The Antiterrorism and Effective Death Penalty Act of 1996

12   ("AEDPA") amended section 2254 to impose new restrictions on federal habeas review. A

13   petition may not be granted with respect to any claim that was adjudicated on the merits in state

14   court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary

15   to, or involved an unreasonable application of, clearly established Federal law, as determined by

16   the Supreme Court of the United States; or (2) resulted in a decision that was based on an

17   unreasonable determination of the facts in light of the evidence presented in the State court

18   proceeding." 28 U.S.C. § 2254(d).

19        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

20   arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a

21   question of law or if the state court decides a case differently than [the United States Supreme]

22   Court has on a set of materially indistinguishable facts." <u>Williams (Terry) v. Taylor</u>, 529 U.S.

23   362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may

24   grant the writ if the state court identifies the correct governing legal principle from the [United

25   States Supreme] Court's decisions but unreasonably applies that principle to the facts of the

26   prisoner's case." <u>Id.</u> at 413. "[A] federal habeas court may not issue the writ simply because that

27   court concludes in its independent judgment that the relevant state-court decision applied clearly

28   established federal law erroneously or incorrectly. Rather, that application must also be

United States District Court
Northern District of California

4

1    unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry

2    should ask whether the state court's application of clearly established federal law was "objectively

3    unreasonable." Id. at 409.

4           Section 2254(d)(1) restricts the source of clearly established law to the United States

5    Supreme Court's decisions.  "[C]learly established Federal law, as determined by the Supreme

6    Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme]

7    Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

8    "A federal court may not overrule a state court for simply holding a view different from its own,

9    when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540

10   U.S. 12, 17 (2003).

11          **B.      Petitioner's Instructional Error Claim**

12          Petitioner raises two related instructional error claims.  First, Petitioner takes issue with the

13   1996 version of CALJIC No. 8.71, which was given to the jury in his trial, providing:

14                  If you are convinced beyond a reasonable doubt and unanimously
                    agree that the crime of murder has been committed by the defendant
15                  but unanimously agree that you have a reasonable doubt whether the
                    murder was of the first or the second degree, you must give the
16                  defendant the benefit of that doubt and return the verdict fixing the
                    murder of the second degree as well as a verdict of not guilty of
17                  murder in the first degree.

18   Second, Petitioner takes issues with the 1996 version of CALJIC No. 8.72, which was also given

19   to the jury in his trial, providing:

20                  If you are convinced beyond a reasonable doubt and unanimously
                    agree that the killing was unlawful but you unanimously agree that
21                  you have a reasonable doubt whether the crime was murder or
                    manslaughter, you must give the defendant the benefit of that doubt
22                  and find it to be manslaughter rather than murder.

23          Petitioner argues that these jury instructions violated his constitutional right to have all

24   elements of an offense proven beyond a reasonable doubt.  ECF No. 1 at 17.  This claim was

25   presented to the California Court of Appeal on direct appeal.  The California Court of Appeal

26   denied this claim in a reasoned opinion, and the California Supreme Court summarily denied

27   review.  Accordingly, in evaluating Petitioner's claim, the Court examines whether the California

28   Court of Appeal's decision was contrary to, or an unreasonable application of, federal law, or

United States District Court
Northern District of California

5

1   resulted in a decision that was based on an unreasonable determination of the facts in light of the

2   evidence presented in the state court proceeding.  See Robinson v. Ignacio, 360 F.3d 1044, 1055

3   (9th Cir. 2004) ("When applying [AEDPA], the federal court should review the last reasoned

4   decision by a state court . . . .") (internal quotation marks omitted).

### 1.      Background Law

6       "[T]he Due Process Clause protects the accused against conviction except upon proof

7   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

8   charged."  In re Winship, 397 U.S. 358, 364 (1970).  This constitutional principle prohibits the

9   State from using evidentiary presumptions in a jury charge that have the effect of relieving the

10  State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime.

11  See Yates v. Evatt, 500 U.S. 391, 400–03 (1991); Carella v. California, 491 U.S. 263, 265–66

12  (1989); Francis v. Franklin, 471 U.S. 307, 313 (1985); Sandstrom v. Montana, 442 U.S. 510, 520–

13  24 (1979).

14      "[I]n reviewing an ambiguous instruction . . . , we inquire 'whether there is a reasonable

15  likelihood that the jury has applied the challenged instruction in a way' that violates the

16  Constitution."  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Boyde v. California, 494 U.S.

17  370, 380 (1990)).  See also Waddington v. Sarausad, 555 U.S. 179, 190–91 (2009) ("[T]he

18  defendant must show both that the instruction was ambiguous and that there was 'a reasonable

19  likelihood' that the jury applied the instruction in a way that relieved the State of its burden of

20  proving every element of the crime beyond a reasonable doubt.").  A "meager 'possibility'" that

21  the jury misapplied the instruction is not enough.  Kansas v. Carr, 136 S. Ct. 633, 643 (2016)

22  (quoting Boyde, 494 U.S. at 380).  While an individual jury instruction must be considered "in the

23  context of the jury charge as a whole," Francis, 471 U.S. at 309, additional jury instructions that

24  contain language that "merely contradicts and does not explain a constitutionally infirm

25  instruction will not suffice to absolve the infirmity" because a reviewing court would have "no

26  way of knowing which of the two irreconcilable instructions the jurors applied in reaching their

27  verdict," id. at 322.

28

United States District Court
Northern District of California

### 2.  Procedural History Relevant to Instructional Error Claim

At Petitioner's trial, the trial court instructed the jury with the 1996 versions of CALJIC Nos. 8.71 and 8.72.  On direct appeal, Petitioner argued that these instructions "[i]n substance . . . told jurors that unless they had unanimous reasonable doubt as to degree of murder, a verdict of first degree was required by operation of law; and unless they had unanimous reasonable doubt as to murder vs. manslaughter, a verdict of murder was required by operation of law."  Frazier, 2014 WL 505354, at *4.  The California Court of Appeal rejected this argument, finding "no reasonable likelihood on the record before [it] that the jury misconstrued the instructions or misapplied the law" in the manner suggested by Petitioner.  Id. at *5.  This conclusion was premised on two lines of reasoning.

First, the California Court of Appeal considered other instructions provided to the jury, which it found may have mitigated any impermissible burden-shifting stemming from the challenged jury instructions.  Id.  In particular, the California Court of Appeal noted that the trial court instructed the jury with CALJIC 17.10, which provided: "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, you may nevertheless convict him of any lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of the lesser crime . . . ."  Id.  The California Court of Appeal also noted that the trial court instructed the jury with CALJIC Nos. 17.11 and 17.40, which provided:

CALJIC No. 17.11

> If you find the defendant guilty of the crime of murder, but have a reasonable doubt as to whether it is of the first or second degree, you must find him guilty of that crime in the second degree.

CALJIC No. 17.40

> The People and the defendant are entitled to the individual opinion of each juror. Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors. Do not hesitate to change an opinion if you are convinced it is wrong. However, do not decide any question in a particular way because a majority of jurors, or any of them, favor that decision.  Do not decide any issue in this case by the flip of a coin, or by any other chance determination.

Id.  The California Court of Appeal then concluded that there was no reasonable likelihood that

United States District Court
Northern District of California

the jury misapplied the law because "[t]he unanimity language of CALJIC Nos. 8.71 and 8.72

[was] framed in terms of *returning verdicts*, not individual juror *decision making*," whereas the

other jury instructions made it clear that "each juror is not bound to follow the remainder in

*decisionmaking*." Id. (emphasis in original).

Second, the California Court of Appeal reasoned that "[t]he trial record in fact clearly

demonstrates that the jurors . . . were not confused by CALJIC Nos. 8.71 or 8.72." Id. The

California Court of Appeal described the jury's deliberation process as follows:

> The jury began deliberations on the afternoon of August 31, 2011.
> The next morning, the jurors sent a note to the court focusing
> on CALJIC No. 17.11[1] and asking if the instruction directed them to
> return a verdict of *second degree murder* if there was unanimity on
> murder, but disagreement as to degree.[2] The court responded that the
> issue of reaching unanimity was within the jury's
> discretion.[3] Shortly thereafter, the jury foreperson advised the court
> that they had reached a verdict on one of the defendants, but were
> deadlocked on the second.[4] At 3:25 p.m. on September 1, 2011, the
> jury returned its verdict finding Townsend guilty of first degree
> murder. The jury continued deliberating on Frazier's case for a
> matter of days thereafter, returning the second degree murder verdict
> on September 6, 2011. Before doing so, the jury sent notes to the
> court indicating lack of unanimity as to the degree of murder as to
> Frazier,[5] and inquiring about aider and abettor liability and the
> mental state required of an aider and abettor where the principal
> (Townsend) had been convicted of first degree murder.

---

[1] CALJIC No. 17.11 provided: "If you find the defendant guilty of the crime of murder, but have a reasonable doubt as to whether it is of the first or second degree, you must find him guilty of that crime in the second degree." 2 Clerk's Transcript ("CT") 575 (lodged with the district court by the government).

[2] Jury request number 7 stated: "If we all agree on murder but we disagree on first or second degree does 17:11 direct us to convict on second degree." 3 CT 604.

[3] At this point, the California Court of Appeal's decision included a footnote, stating:

> The court advised the jury to see CALJIC Nos. 17.40 [parties
> entitled to individual opinion of each juror] and 17.50 [all twelve
> jurors must agree], and suggested that CALJIC Nos.
> 17.10, 8.71, 8.74 and 17.11 might be helpful. All counsel agreed to
> the content of the court's response.

[4] Jury request number 9 stated: "We have one decision and are very deadlocked on the unanimity of the second verdict." 3 CT 600.

[5] Jury request number 14 stated: "We are all hung up between 1st and 2nd degree murder. Some jurors will not change their stance and we have not been able to convince them. And we don't want to coerce anyone. So we are hung up. Further deliberations may not change this." 3 CT 613.

United States District Court
Northern District of California

1    Id. (emphasis in original).

2         Based on the jury's deliberation process, the California Court of Appeal concluded that

3    "[t]he jurors quite obviously unanimously rejected manslaughter as a possible verdict almost

4    immediately (rendering CALJIC No. 8.72 irrelevant), and quite clearly understood that their

5    individual judgments were required in determining the degree of murder for both Townsend and

6    Frazier." Id. The court went on to explain that "[t]he jurors' questions and the differentiated

7    verdicts amply demonstrate that the jurors did not view first degree murder as the 'default' verdict

8    in the event of lack of unanimity." Id. Accordingly, the court concluded that "[t]here was no

9    error." Id.[6]

10               **3.    Analysis**

11        In his habeas petition, Petitioner argues that the 1996 version of CALJIC No. 8.71, by

12   directing jurors that they were required to return a second-degree murder verdict if they

13   "unanimously agree[d] that [they had] a reasonable doubt" as to the degree of murder, "implied

14   that if the jurors didn't unanimously agree they had reasonable doubt of the degree of murder, they

15   were not required to give the petitioner the benefit of any doubt on degree and would have to

16   return a verdict of first degree murder." ECF No. 1 at 17. Petitioner likewise argues that the 1996

17   version of CALJIC No. 8.72 "implied that if jurors didn't unanimously agree that they had

18   reasonable doubt that the crime was murder, they were not required to give the defendant the

19   benefit of any doubt and were required to return a verdict of murder." Id.

20        For the purposes of this order, the Court assumes that the challenged jury instructions are

21   ambiguous in the manner argued by Petitioner in that a juror could potentially[7] read these jury

22   instructions to (1) require the returning of a verdict of first degree murder where the jury

23   unanimously agreed that the defendant was guilty of murder, but did not unanimously agree as to

24

25   [6] The California Court of Appeal also found that "[f]or the same reasons, we would conclude that
     any error was harmless, whether applying the *Watson* standard . . . or the more stringent *Chapman*
26   test . . . ." Frazier, 2014 WL 505354, at *5 n.5

27   [7] Importantly, the Court notes that this potential manner of reading the challenged jury instructions
     is not the only possible interpretation, and does not necessarily follow from the language of the
28   jury instructions as a matter of formal logic. Indeed, Petitioner does not argue that the implication
     he offers is the only way in which the jury could have interpreted the challenged jury instructions.

United States District Court
Northern District of California

the degree of murder (CALJIC No. 8.71); and (2) require a finding of murder where the jury unanimously agreed that the killing was unlawful, but where the jury did not unanimously agree as to murder versus manslaughter.[8]  That is, the Court assumes that CALJIC Nos. 8.71 and 8.72 could have been interpreted by the jury in a way that violated Petitioner's right that the prosecution be required to prove each of the elements of the charged offense beyond a reasonable doubt.  Nonetheless, the Court concludes that the California Court of Appeal's decision rejecting Petitioner's argument was not contrary to, and did not unreasonably apply, federal law.

"[I]n reviewing an ambiguous instruction . . . ," the reviewing court must ask "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde, 494 U.S. at 380).  The California Court of Appeal did just this, concluding that there was "no reasonable likelihood on the record before us that the jury misconstrued the instructions or misapplied the law."  Frazier, 2014 WL 505354, at *5.  The California Court of Appeal supported this conclusion, in part, by looking at the jury's deliberation process in this case, which description is excerpted above.

In particular, the California Court of Appeal noted that on the second day of deliberation, "the jurors sent a note to the court focusing on CALJIC No. 17.11 and asking if the instruction directed them to return a verdict of *second degree murder* if there was unanimity on murder, but disagreement as to degree."  Id. at *5 (emphasis in original).  Shortly after the trial court responded to the jury's question, "the jury foreperson advised the court that they had reached a verdict on one of the defendants, but were deadlocked on the second."  Id.  The jury then returned a verdict finding Townsend guilty of first degree murder and re-convened to further deliberate regarding Frazier.  Id.  After several more days of deliberation, the jury returned a verdict finding Frazier guilty of second degree murder.  Id.  Based on these facts, the California Court of Appeal

---

[8] The Court notes that in People v. Moore the California Supreme Court "conclude[d] the better practice is not to use the 1996 revised versions of CALJIC Nos. 8.71 and 8.72, as the instructions carry at least some potential for confusing jurors about the role of their individual judgments in deciding between first and second degree murder, and between murder and manslaughter."  51 Cal. 4th 386, 411 (2011).  The Court also notes that "[a]fter Moore was decided, CALJIC Nos. 8.71 and 8.72 were amended to remove the contested unanimity language."  Frazier, 2014 WL 505354, at *4 n.3.

United States District Court
Northern District of California

1   reasonably concluded that "[t]he jurors quite obviously unanimously rejected manslaughter as a

2   possible verdict almost immediately (rendering CALJIC No. 8.72 irrelevant), and quite clearly

3   understood that their individual judgments were required in determining the degree of murder for

4   both Townsend and Frazier."  Id.  The California Court of Appeal also reasonably concluded that

5   "[t]he jurors' questions and the differentiated verdicts amply demonstrate that the jurors did not

6   view first degree murder as the 'default' verdict in the event of lack of unanimity."  Id.

7           Petitioner argues that the fact that the jury "inquired whether [it] was required to convict

8   on second degree if they all agreed on murder but disagreed on degree" suggests that the jury

9   misapplied the 1996 version of CALJIC No. 8.71 with respect to Petitioner.  ECF No. 15-1 at 5.

10  Although this is one possible conclusion that could be drawn from the jury's question, a more

11  probable conclusion based on these facts (and the conclusion reached by the California Court of

12  Appeal) is that on the second day of jury deliberations, the jury unanimously decided to convict

13  Petitioner of first degree murder, but was not unanimous as to the degree of murder for which

14  Frazier should be convicted.  Indeed, after the trial court responded to the jury's question

15  regarding unanimity, the jury quickly returned a verdict finding Petitioner guilty of first degree

16  murder before deliberating for several more days to find Frazier guilty of second degree murder.

17  Frazier, 204 WL 505354, at *5.  Moreover, before finding Frazier guilty of second degree murder,

18  the jury sent the trial judge another note, stating: "We are all hung up between 1st and 2nd degree

19  murder."  3 CT 613.  Based on this second note, the California Court of Appeal could have

20  reasonably concluded that the jury had been "hung up between 1st and 2nd degree murder" with

21  respect to Frazier the whole time, and that there was never any question in the jury's mind as to

22  the degree of murder for which Petitioner should be found guilty.  Accordingly, this Court cannot

23  conclude that the California Court of Appeal's decision so holding was "objectively

24  unreasonable."  White v. Woodall, 134 S. Ct. 1697, 1702 (2014).

25          Accordingly, the Court denies the Petitioner's instructional error claim.

26  **C.      Petitioner's Evidentiary Error Claim**

27          Petitioner next claims that the trial court erred in admitting co-defendant Maurice Frazier's

28  testimony that he had heard from a friend that Petitioner's father wanted to hire Frazier an

11

1    attorney.  According to Petitioner, this error violated his constitutional due process rights because

2    the admitted evidence was prejudicial, irrelevant, and hearsay.

3                                    **1.      Background Law**

4          "On federal habeas review," a court "may consider only whether the petitioner's

5    conviction violated constitutional norms. . . . Even where it appears that evidence was erroneously

6    admitted, a federal court will interfere only if it appears that its admission violated fundamental

7    due process and the right to a fair trial." Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999)

8    (internal citations omitted).  Failure to comply with state rules of evidence is neither a necessary

9    nor a sufficient basis for granting federal habeas relief on due process grounds.  Id.; Jammal v.

10   Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  In federal habeas review, the due process

11   inquiry is whether the admission of evidence was "arbitrary or so prejudicial that it rendered the

12   trial fundamentally unfair." Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995).  But "[o]nly if

13   there are *no* permissible inferences that the jury may draw from the evidence can its admission

14   violate due process." See Jammal, 926 F.2d at 920 (emphasis in original).

15               **2.      Procedural History Relevant to Evidentiary Error Claim**

16         The California Court of Appeal recounted the testimony related to Petitioner's evidentiary

17   error claim as follows:

18               At the outset of Frazier's direct examination,[9] his counsel elicited
             testimony over Townsend's objection, that Frazier had been told by
19           another inmate not to testify and his life was threatened if he did.
             Frazier said he had been assaulted on two occasions while in
20           custody and that he was told by those assaulting him that it was
             because he "snitch[ed] on Little G." Townsend is also known as
21           "Little G." Frazier further testified that following his arrest, a friend
             had told him that Townsend's father (known as "Big G") "wanted to
22           get me a lawyer." Frazier said that Townsend had told him not to
             testify when both were being transported from court ("He told me
23           not to get on the stand"), but Frazier specifically said that Townsend
             had not threatened him on that occasion or any other.

24               After extended discussion with counsel out of the presence of the
25           jury, the court formulated limiting instructions on consideration of
             testimony, by Frazier and by other witnesses, concerning witness
26           intimidation.  Before concluding Frazier's direct testimony, the
             court advised the jurors that such evidence was to be considered for

27

28   _____
     [9] Frazier testified in his own defense at trial.

United States District Court
Northern District of California

only the limited purpose of evaluating a witness's credibility and that "evidence related to witness intimidation cannot be used against a defendant unless you first find that the defendant either made the threats or authorized another to make the threat. [¶] . . . [¶] If you do not first find that a defendant authorized another to do this or did it themselves, you are limited to using this evidence to evaluate witness credibility."[10]

Frazier, 2014 WL 505354, at *7–8.

On direct appeal, Townsend's evidentiary error claim "focuse[d] on Frazier's testimony that Townsend's father reportedly wanted to obtain an attorney for Frazier . . . ." Id. Townsend argued that admission of this statement was reversible error, "contending that the evidence was irrelevant and unduly prejudicial." Id. Townsend also argued that "the obvious inference was that Mr. Townsend was in league with his father in trying to muzzle Mr. Frazier as a witness." Id.

The California Court of Appeal rejected this argument, finding that the trial court "carefully considered the prejudicial impact of the testimony, but found that it was 'highly, highly probative . . . based on the facts of this case.'" Id. at *8.  In particular, the California Court of Appeal noted that the trial court found the challenged testimony was relevant given that "we've had active witness intimidation activity in this courtroom during this trial" and given that "all three attorneys have always maintained that witness intimidation is an issue that is entwined with the facts of this case and cannot be separated . . . ." Id.  The California Court of Appeal thus found "no basis to conclude that the jurors adopted the inference Townsend suggests from the very limited testimony concerning Townsend's father in the face of the court's express instructions to contrary, and Frazier's testimony that he was never threatened by Townsend." Id.

### 3.     Analysis

In his federal habeas petition, Petitioner argues that the California Court of Appeals erred in holding that the trial court did not violate his right to a fair trial by erroneously admitting Frazier's testimony over objections of hearsay and relevance.  ECF No. 1 at 25.  Because the trial involved evidence of witness intimidation and an understanding that "snitching was strongly disapproved [of] in the [defendants'] community," Petitioner claims that Frazier's testimony

---

[10] Townsend's attorney did not object to the limiting instruction.  Frazier, 2014 WL 505354, at *8.

United States District Court
Northern District of California

1    "created a strong inference that petitioner himself was part of this witness intimidation, an

2    inference that would not have existed without error." Id. (internal quotations omitted).  According

3    to Petitioner, "Frazier's testimony that an associate of petitioner had [t]old him that petitioner's

4    father wanted to hire Frazier a lawyer provided the missing link that petitioner was involved with

5    his father in an effort to coerce Frazier as a witness." ECF No. 1 at 28.

6         The government responds that the trial court "reasonably concluded that [the challenged

7    evidence] was highly probative of Frazier's credibility, especially given the numerous acts of

8    witness intimidation that had taken place in the case." ECF No. 9-1 at 34.  In this way, "[t]he

9    effect of the information on Frazier was relevant to his claim that he was putting himself in great

10   peril by pointing the finger at petitioner and being labeled a snitch." Id.  Thus, the government

11   contends, "because the jury could draw a permissible inference from such evidence, its admission

12   did not violate petitioner's right to a fair trial." Id. (citing Jammal, 926 F.2d at 920 ("Only if there

13   are *no* permissible inferences the jury may draw from the evidence can its admission violate due

14   process.") (emphasis in original)).

15        The Court concludes that Petitioner's claim fails because he has not articulated any

16   Supreme Court authority to which the California Court of Appeal's decision upholding the trial

17   court's evidentiary ruling is contrary or of which the California Court of Appeal's decision is an

18   unreasonable application.  Indeed, the Supreme Court "has not yet made a clear ruling that

19   admission of irrelevant or overtly prejudicial evidence constitutes a due process violation

20   sufficient to warrant issuance of the writ." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.

21   2009) (finding that trial court's admission of irrelevant pornographic materials resulted in a trial

22   that was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an

23   unreasonable application of, clearly established Supreme Court precedent under 28 U.S.C. §

24   2254(d)).  See also Zapien v. Martel, 805 F.3d 862, 869 (9th Cir. 2015) ("Because there is no

25   Supreme Court case establishing the fundamental unfairness of admitting multiple hearsay

26   testimony, *Holley*" bars such claims on federal habeas review.).  Moreover, the Court agrees that

27   one permissible inference that the jury could have drawn from Frazier's testimony regarding

28   Petitioner's father seeking to "get [him] a lawyer" was that Frazier's state of mind as he testified at

United States District Court
Northern District of California

14

1    trial was one of fear and intimidation.[11]  Because "there is a rational inference the jury could draw

2    from the challenged evidence, an inference that is not constitutionally impermissible," Petitioner's

3    evidentiary claim fails.  Jammal, 926 F.2d at 920.

4    **D.    Cumulative Effect**

5          Petitioner mentions in passing that, even if the state court errors individually do not justify

6    relief, the cumulative effect of all errors resulted in a fundamentally unfair trial.  ECF No. 14 at

7    92, 101.  In some cases, although no single trial error is sufficiently prejudicial to warrant the

8    granting of a habeas petition, the cumulative effect of several errors may still prejudice a

9    defendant so much that his conviction must be overturned.  See Alcala v. Woodford, 334 F.3d

10   862, 893–95 (9th Cir. 2003).  Here, there is no single constitutional error because Mr. Nguyen has

11   failed to demonstrate ineffective assistance of counsel with respect to any of his claims.

12   Accordingly, there is nothing to accumulate.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th

13   Cir. 2002).  Because Petitioner has not shown a single constitutional error, his cumulative error

14   claim necessarily fails.  Accordingly, this claim is denied.

15   **E.    Certificate of Appealability**

16         The federal rules governing habeas cases brought by state prisoners require a district court

17   that issues an order denying a habeas petition to either grant or deny therein a certificate of

18   appealability.  See Rules Governing § 2254 Case, Rule 11(a).

19         A judge shall grant a certificate of appealability "only if the applicant has made a

20   substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

21   certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a district

22   court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)

23   is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district

24   court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S.

25   473, 484 (2000).

26   _____

27   [11] Frazier's counsel told to the court that he sought to introduce the challenged evidence "to
     explain to the jury my client's state of mind as he is having to do his testimony and why -- to
28   factor that in when evaluating his demeanor on the stand and what he has to say."  6 Reporter's
     Transcript 808 (lodged with the district court by the government).

United States District Court
Northern District of California

1    Here, Petitioner has not made such a showing, and, accordingly, a certificate of

2    appealability will be denied.

3    **CONCLUSION**

4    The California Court of Appeal's adjudication of petitioner's claims did not result in a

5    decision that was contrary to, or involved an unreasonable application of, clearly established

6    Supreme Court precedent, nor did it result in a decision that was based on an unreasonable

7    determination of the facts in light of the evidence presented in the state court

8    proceeding.  Accordingly, the petition is denied.  Additionally, a certificate of appealability is

9    denied.

10    IT IS SO ORDERED.

11    Dated: October 7, 2016

12    _____

13    JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

16